## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Matthew J. Deurmeier, hereafter referred to as "Affiant," am a Special Agent (SA) of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been employed by the FBI as a Special Agent for over five years and am currently assigned to the FBI Bozeman Resident Agency in Bozeman, Montana. I have training and experience in conducting federal criminal investigations and have worked criminal matters involving terrorism, violent criminal offenses, white collar offenses, and civil rights matters.  In addition, I am assigned to conduct national security investigations as a member of the Joint Terrorism Task Force ("JTTF").  I have participated in numerous national security investigations and have received extensive training and experience in the conduct of national security investigations including both domestic and international terrorism.

2. This affidavit is submitted in support of a Criminal Complaint charging William Krisstofer Wolf ("Wolf") of Bozeman, Montana with knowingly possessing a machine gun, in violation of 18 U.S.C. § 922(o).

3. The facts set forth in this Affidavit are based upon your Affiant's personal involvement in this investigation, training and experience, his review of relevant

1

evidence, and information supplied to him by other law enforcement officers. This Affidavit is intended to show that there is probable cause and does not purport to set forth all of the Affiant's knowledge of, or investigation into, this matter.

4.   This application refers to an individual by their status as Confidential Human Sources ("CHS").  The FBI has interviewed this individual and is aware of their true identity.   Likewise, the CHS has provided reliable information to the FBI in the past and has not been known to provide false or misleading information and some of the information has been able to be corroborated by independent investigative means.

## SUMMARY OF INVESTIGATION AND PROBABLE CAUSE

### *Wolf's Weekly Webcast*

5.   In and around November 2013, Wolf began broadcasting a weekly internet webcast named "The Montana Republic" on the website www.blogtalkradio.com. Wolf claimed the purpose of the webcast was to bring like-minded patriots from across the country together to discuss current topics, often times highlighting issues taking place in the surrounding Bozeman area, and to educate the public on how to counter action at the local, state and federal levels that were viewed as overstepping on constitutional rights.  Over the next twelve months, Wolf

2

repeatedly espoused his contempt for local judges, law enforcement, the county attorney, city and county commissioners, and the agents and agencies of the federal government.  Wolf advocated for the "citizen's arrests" of the judges involved in the case of a local resident, and self-described "sovereign," because Wolf believed the court/judges had violated this individual's rights.  Wolf cited Montana State Code as justification for executing citizen arrests with probable cause and stated his intention to use a means of force if necessary to effectuate those arrests.

6.   During these weekly webcasts, guests on Wolf's show advocated for the affirmative targeting of law enforcement officers if it was believed they were in violation of their oath of office or if probable cause was perceived that they had committed a criminal offense.  In conjunction with such pleas, Wolf called for a "restoration of the constitutional government."  The plan consisted of taking back local government at the smallest geographic area and expanding control to the state level, seizing control of public facilities, suppressing law enforcement capabilities and enacting loyalty oaths.  Several webcasts detailed taking out bridges or power grids and seizing law enforcement vehicles and weapons.  Wolf stated on multiple occasions that he considered agents of the government (local, state, or federal) to be the true enemy to the American people.

3

7.   In June 2014, Wolf advocated that, "Until we get the federal government, not the government, the agents and agencies of the federal government, out of our local government, our local police officers, we don't stand any chance but shooting." Wolf then compared shooting law enforcement officers to gopher hunting.

8.   In a July 2014 webcast, Wolf asked his program listeners "Are you willing to attempt a restoration of our constitutional government?  Because that is what we are going to do. What's it going to do to us? It will put a lot of us in the grave. But I guarantee you it will put a lot more of them in the grave."  Wolf further specified that, "When the war starts, there won't be anyone who is safe.  Just because you have a badge or a black robe isn't going to protect you."

9.   In an October 2014 webcast, a regular guest on Wolf's webcast stated that federal judges who overturned gay marriage bans are now viable targets because they violated the Constitution.  Wolf agreed with his guest's position and further added, "As it sits folks, please understand, I firmly believe that all agents of the government, all judiciary, and all police officers are targets."

10.  By November, Wolf concluded "The Montana Republic" webcasts by informing his listeners that the time for talking was over.

*Wolf Meets With FBI CHS and UCE to Further His Plan*

11. In July 2014, Wolf met with an FBI CHS where he described his intention to develop a "blowtorch gun" with a range of up to 150 feet for the purpose of protection against law enforcement officers wearing body armor.  Wolf stated he believed he could build one in about a week and that he had been in contact with others out of state that were also planning to build similar weapons.

12. On September 30, 2014, Wolf again met with a CHS where he discussed the Bozeman Police Department's recent acquisition of a "BearCAT" armored vehicle.  Wolf stated the need to destroy the vehicle and that the most effective method would be "cooking it from the inside."  Wolf reiterated his plan from several months prior to build a "blowtorch gun."  During this meeting, Wolf expressed interest in CHS introducing Wolf to a former colleague who could possibly provide technical or monetary assistance in building the gun.

13. On October 10, 2014, a CHS introduced Wolf to the colleague, who in actuality was a FBI undercover employee ("UCE").  During the first meeting, Wolf discussed with the UCE the police department's recent acquisition of the "BearCAT" vehicle, body armor, and the type of rifle rounds needed to suppress targets.

14.  On December 18, 2014, the CHS, UCE and Wolf met again.  Wolf described his plan to conduct a meeting in late January 2015 for the purpose of educating the public about "committees of safety."  Wolf viewed these committees of safety as the last peaceful method to address his grievances with the government.  He likewise felt that these committees were not his preferred method, but "it is buying us time so we can draw our numbers."

15.  During the meeting with the CHS and UCE, Wolf repeatedly detailed his desire to use a flamethrower against law enforcement officers, as oppose to other weapon systems, stating that it would be an effective method to neutralize officers wearing body armor.  Wolf was knowledgeable about flamethrowers including identifying their components, describing how easy it is to make napalm, how the flamethrower operates, and his familiarity with Russian-made flamethrowers.  Wolf stated his intent to use a flamethrower should law enforcement officers arrive at his property in their armored vehicle to detain him. Wolf also stated that it was not his desire to get in a firefight with law enforcement officers because of how well equipped they are, unless he "had an equal amount of firepower in a coordinated event."  At one point during the meeting, the UCE stated to Wolf that he would ask his contacts about acquiring a

flamethrower for Wolf.[1]   Wolf immediately replied, "Try to get me a Russian automatic shotgun too."

16.  On January 28, 2015, the CHS, UCE, and Wolf met and Wolf again expressed his desire for the UCE to acquire a Russian fully-automatic shotgun for him.  The UCE and Wolf discussed the differences between several Russian models of automatic shotguns to which Wolf stated he preferred the Saiga-12 fully automatic shotgun due to its durability.  Wolf stated, "Any fully auto shotgun is going to handle most riot crowds and cops."  Wolf explained his reason for wanting the shotgun, stating, "Like I said, the purpose of the gun is not to go hunting with.  It's to clean house."  Wolf also stated, "One of those or a few of those on the street and those cops aren't going to know what's coming."  Wolf also described his desire to obtain his own armored vehicle and convert the vehicle to be a flamethrower vehicle because "there is nothing in the world that's going to solve a problem quicker than napalm.  The only thing we have to worry about in this area is law enforcement."  The UCE told Wolf that his supplier acquires his weapons from the military and that with his supplier, "there's no paper...nobody knows you've got it."  Wolf replied, "I love that."  The UCE

---

[1] The possession of the type of flamethrower described by Wolf to the UCE is not regulated under the laws of the United States and thus would not violate federal law to possess such a device.

stated that his supplier would sell multiple Saiga shotguns to the UCE for approximately $600, which includes the weapons being equipped with a collapsible stock.  Wolf replied "That's what I want."

17. As previously described to the CHS and UCE, the next day Wolf did in fact host a committee of safety meeting on January 29, 2015.  The CHS and the UCE attended the meeting.  At the conclusion of the meeting, Wolf stayed after for approximately an hour to talk with several individuals who were in attendance. Wolf stated, "My preferred method, I'm serious; my preferred method would be to drop 500 pounds of napalm through the roof of the [Gallatin County] courthouse and burn it to the ground and roast some marshmallows on it.  That's why I said, 'You don't want me doing this.'  I don't believe in doing anything that's not extreme and right now, wiping that place out would be my extreme movement and then my next answer would be 'Ok, which county, city building is going to be next?  Or will you vacate the office?'  That's all I believe in."

18. In response to Wolf's comments, one individual present stressed to Wolf that caution should be exercised.  Wolf countered that he did not need to be careful with what he said, that if "they" wanted to put him in jail, they had better bring a coroner and several body bags.  Wolf said he believed that "once a few of these law agents get popped," it would deter other law enforcement officers from

8

carrying out their jobs.  He further stated, "You've got people like me who have other things that they're going to do to them, but that's fine.  If they're hiding in their bunker, they're not enforcing any law.  We're good.  They're nullified."

19.  Wolf further stated that, "You can lead a horse to water but you can't make them drink.  But you can shoot his ass in the back of its head and bring another horse to the water.  I really am not all the good person that people think I am.  That's why [the sheriff] stays his ass away from me.  Got [the county attorney] keeps his ass away from me.  Because they know who I am.  I cannot be a committee of safety.  I will bring you to the water, I will show you how to do it."  Several minutes later Wolf says reiterated, "You need people like me who've got the drive to do what is necessary."  At the conclusion of the meeting, the UCE informed Wolf that he would be bringing the previously discussed "package" to which Wolf acknowledged and indicated he would have a method of payment.

20.  A CHS reported that the day after the committee of safety meeting Wolf purchased ceramic plates for body armor from a Park County resident.

21.  Several days later, on February 9, 2015, the CHS exchanged text messages with Wolf.  The CHS asked Wolf what size barrel Wolf preferred on the Saiga-12 fully-automatic shotgun he would be purchasing from the UCE.  The CHS asked Wolf if he wanted the standard-sized barrel (full length) or a shortened military-

grade barrel. Wolf replied that he wanted the shortened (sawed-off) military grade barrel.

22. The FBI acquired a firearm with the specifications desired by Wolf—*i.e.*, a Saiga-12 fully-automatic shotgun with a shortened military grade barrel. FBI Headquarters modified a semi-automatic Saiga-12 gauge shotgun to a fully-automatic with a shortened barrel. The UCE then made a video recording showing the Saiga-12 shotgun where the UCE demonstrated the fully automatic capabilities of the firearm. The UCE shot two different 10 round magazines containing 12 gauge ammunition through the firearm. The UCE expended a 10 round magazine in about two seconds with one pull of the trigger. The video recording showed the firearm up close and captured the serial number and the shortened barrel. A copy of this video was forwarded to the CHS.

23. On March 18, 2015, the CHS met with Wolf where the CHS showed Wolf the video recording made by the UCE. Wolf watched the video and saw the fully-automatic capability of the firearm he would be purchasing. The CHS also informed Wolf that the price of the shotgun would be $725.00. The CHS stated that in addition to the $600.00 previously arranged for by the UCE, an additional $125.00 was necessary due to the conversion of the shotgun to fully automatic. Wolf agreed to the pay the extra $125.00 for the conversion.

10

### *Possession of Automatic Shotgun by Wolf*

24. On March 25, 2015, the UCE met Wolf at a truck stop in Livingston, Montana. Prior to the transaction of selling the Saiga-12 shotgun to Wolf, the UCE and Wolf discussed the shotgun.  The UCE informed Wolf that his "supplier" was a Class III dealer and had converted the firearm from semi-automatic to full-automatic, to which Wolf acknowledged.   The UCE referenced the video that was shown to Wolf by the CHS on March 18, 2015, where the UCE had explained to Wolf in the recording that the firearm had a single action and full-automatic feature.  The UCE informed Wolf that during the making of the video, he had timed the firing of 10 rounds of 12 gauge ammunition contained in one clip.  The UCE told Wolf that all these rounds could be expended in1.9 seconds while shooting in automatic mode.

25. The UCE and Wolf exited the truck stop.  The UCE went to the rear of his vehicle.  Wolf went to his vehicle which was parked in different location in the parking lot.  Wolf then moved his vehicle next to the UCE's vehicle.  The UCE opened the rear hatch of his vehicle.  While both of them stood behind the UCE's vehicle, the UCE opened the case containing the Saiga-12, fully-automatic shotgun with the shortened barrel (less than 18" in length) to show it to Wolf. While located at the rear of the vehicle, Wolf stated that he was extreme and he

11

believed in "cutting the head off the snake."  Wolf then paid the UCE $720.00 for the firearm and took possession of it from the UCE.  Wolf placed the encased firearm into his vehicle.  Wolf was then taken into custody by the FBI without incident.

26.  Once in custody, Wolf provided both verbal and written consent to your Affiant to enter his vehicle for the purpose of retrieving the Saiga-12 shotgun that he had just purchased from the UCE.

27.  A FBI firearms expert has examined the Saiga-12 shotgun, serial number 01408040, and determined that it meets the statutory definition of a machinegun. The firearm shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

## CONCLUSION

28.  Based on the information contained in this Affidavit, there is probable cause to believe that William Krisstofer Wolf knowingly possessed a machine gun, in violation 18 U.S.C. § 922(o).


Matthew J. Deurmeier, Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this  26th day of March 2015

_____

United States Magistrate Judge Carolyn S. Ostby
District of Montana

Approved as to form by:

/s/   Bryan R. Whittaker_____ _
Assistant United States Attorney
United States Attorney's Office
Attorney for Plaintiff

13