**BRYAN R. WHITTAKER**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**901 Front Street, Suite 1100**
**Helena, MT 59626**
**Phone: (406) 457-5120**
**FAX: (406) 457-5130**
**E-Mail: Bryan.Whittaker@usdoj.gov**

**DANYA E. ATIYEH**
**Trial Attorney**
**Counterterrorism Section**
**National Security Division**
**U.S. Department of Justice**
**950 Pennsylvania Ave. NW**
**Washington, D.C. 20530**
**Phone: (202) 353-0023**
**E-Mail: Danya.Atiyeh@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 15-49-BLG-SPW** |
| **Plaintiff,** | |
| **vs.** | **UNITED STATES' SENTENCING MEMO** |
| **WILLIAM KRISSTOFER WOLF,** | |
| **Defendant.** | |

The United States of America, by and through its counsel Bryan R. Whittaker, Assistant United States Attorney for the District of Montana, and Danya E. Atiyeh, Trial Attorney, Counterterrorism Section, National Security Division, U.S. Department of Justice, hereby files its sentencing memorandum pursuant to the Court's scheduling order.

## I.    Introduction

Just after taking possession of the machinegun, Wolf reaffirmed his character and intent, stating, I "[don't] believe in anything but extreme."   Gov. Trial Ex. 13k.   Wolf's self-characterization accurately sums up every aspect of this case—extreme.   Wolf's character is extreme.   He is an extremely dangerous individual with no respect for the law.   His extreme abhorrence for the law ascended to such high levels that it drove him to seek out the most dangerous extreme weapons he could imagine to employ in committing extreme lawless acts: kidnapping judges, lighting people on fire, bombing the courthouse, assaulting law enforcement, and committing deliberate homicide.   He made clear the targets of his violence were to be the very individuals sworn to uphold and enforce the law. "I firmly believe that all agents of the government, all judiciary, and all police officers are targets."   Gov. Trial Ex. 7b.   Indeed, minutes before taking possession of the shotgun machinegun with a sawed-off barrel, Wolf reaffirmed his commitment, telling Dirty–whom he believed was his co-conspirator–"I just need

2

to kill the public officials."   Gov. Trial Ex. 13h.   He then stated he was going to "[k]ill the head of the snake."   *Id.*

Wolf claims strong anti-government views and believes that law enforcement officials at every level have committed "constitutional violations." These are not principled views—and certainly they have no merit legally—but nonetheless serve conveniently as a way for Wolf to somehow attempt to convince others and justify himself in acting lawlessly.

In Wolf's world view, he uses his own independent and convenient interpretation of the constitution to justify his illegal activity.   He claims that when lawful agencies such as the county attorney, county sheriff, county commission, Montana Attorney General, FBI, U.S. Marshal's Service, or U.N. are not willing to bring out his political purposes, he is justified in taking matters into his own hands and employing whatever means are necessary to "restore our constitutional republic."   Wolf Trial Tr. at 5, 42-43, 64-68 (*hereinafter* "WTT"). Indeed, after more than a year of talking about it, he decided the time for action had arrived, declaring, "I also know the time for talking is almost over."   Gov. Trial Ex. 8b.   And, "[a]s long as they have their friends behind the robe they think they're safe.   They're not.   Because like you and I, they are only human and this is a frail body that we have."   *Id.*

3

Even at trial, Wolf did not back down from his beliefs in a coming war between himself and other possible likeminded "patriots," and government officials.   He knew he would use dangerous weapons in his battle to uphold "constitutional rights" or "civil rights."   WTT at 43-44.   Wolf testified,

> I want to put this as bluntly as possible.   I would rather go out and scare the living hell out of some police officers, who are going to violate your civil rights, and you've seen this happen over and over again.   So that they would be given the opportunity to surrender. And that's what we want to do.
>
> Unfortunately, will they?   History has shown they won't.

*Id.* at 44.   But Wolf's radical views cannot justify the use of force, violence, or dangerous weapons to enforce what in his independent view may amount to a constitutional or civil rights violation.

Wolf was absolutely serious about following through with his plans.   He made clear that, "I don't like to deceive people."   Gov. Trial Ex. 11c.   "I want them, and, and that's one of the, people tell me that's my great fatal flaw, I'm gonna tell you what I'm going to do to you."   *Id.*   "And the bottom line is, is I do it to you."   *Id.*   In other words, he was unquestionably serious and intended to carry his plan forward.   Indeed, Wolf told those who questioned his motivation and capabilities that, "I'm here to inform you that when you fail, I will succeed." *Id.*

4

Because of the extreme factors present in this case, the Guideline calculation of 51-63 months imprisonment does not adequately reflect the type of sentence necessary to fully address Wolf's dangerous character and propensity for violence, the true nature and circumstances of the offense, the need to protect the public and law enforcement, to deter Wolf and others, and to promote the needed respect for the law.   As such, the United States recommends an upward variance of 57 months.   A total sentence of 120 months is necessary and reasonable in this case.

## II.   The Guidelines in the Presentence Report are correctly calculated.

The Guideline range of 51-63 months is correct.   PSR ¶ 72.   Wolf correctly receives a four-level increase for possessing the firearm in connection with another felony offense.   PSR ¶ 34.   Wolf also correctly receives a two-level increase for obstruction of justice because he committed perjury during his trial testimony by lying about material elements of the offenses.   PSR ¶ 37.

### a.  Wolf possessed the firearm in connection with another felony offense.

The PSR properly applies a four-level adjustment for the defendant's possession of a firearm in connection with another felony offense, or with reason to believe that it would be used or possessed in connection with another felony offense.   U.S.S.G. §2K2.1(b)(6)(B).   This provision applies "if the firearm . . . facilitated, or had the potential of facilitating, another felony offense," which

includes "any federal, state, or local offense, other than the [firearms possession offense], punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained."   U.S.S.G. §2K2.1, Application Note 14(A) and (C).

Wolf knew the machinegun would facilitate, or had the potential to facilitate, numerous felony violations of Montana law, including Assault with a Weapon, in violation of MCA 45-5-213, Assault on a Peace Officer or Judicial Officer, in violation of MCA 45-5-210, and Arson, in violation of MCA 45-6-103.   He repeatedly stated his intent in obtaining the firearm was to threaten, intimidate, assault, and kill police officers, judges, and politicians.   Just moments before taking possession of the machinegun, the defendant told Dirty that "I just need to kill the public officials."   Gov. Trial Ex. 13h.   He went on to say, "And I guarantee you the first few politicians and judges that have their heads blown off . . . [t]he rest of em are going to go into hiding, if they go into hiding they can't do shit."   Gov. Trial Ex. 13i.

In another conversation Wolf said, "once a few of these law agents get popped . . . [t]he rest of em are gonna go hide in their little hidey holes, you got people like me who have other things that they're gonna do to em, and that's fine, if they're hiding in their little bitty bunker, they're not enforcing any law."   PSR ¶ 19.   He said that "any fully auto shotgun is going to handle most riot crowds

6

and cops."   PSR ¶ 17.   Wolf also compared shooting law enforcement officers to gopher hunting, PSR ¶ 8; in another recording he said, "[w]hen the war starts, there won't be anyone who is safe.   Just because you have a badge or a black robe isn't going to protect you." PSR ¶ 9.   In another recording, he said, "I firmly believe that all agents of the government, all judiciary, and all police officers are targets." PSR ¶ 11.

In his own direct testimony, when asked about the violent statements he had made, the defendant testified, "I believe the war is coming.   And when the federal government starts it, I will do everything I can to minimize the losses and to save the republic; save the people.   I know that the front-line people will be law enforcement."   WTT at 43.   He went on to testify,

> When the war starts – I want to put this as bluntly as possible.   I would rather go out and scare the living hell out of some police officers, who are going to violate your civil rights, and you've seen this happen over and over again.   So that they would be given the opportunity to surrender.

*Id.* at 44.

Under Montana law, "a person commits the offense of assault with a weapon if the person purposely or knowingly causes: (a) bodily injury to another with a weapon; or (b) reasonable apprehension of serious bodily injury in another by use of a weapon or what reasonably appears to be a weapon."   MCA 45-5-213. Likewise, "[a] person commits the offense of assault on a peace officer or judicial

officer if the person purposely or knowingly causes," in pertinent part, "(b) reasonable apprehension of serious bodily injury in a peace officer or judicial officer by use of a weapon" or "(c) bodily injury to a peace officer or judicial officer with a weapon."    MCA 45-5-210.    Wolf clearly stated his intent to threaten, assault, and kill "public officials," "politicians and judges," "law agents," "cops," "law enforcement," and "police officers."    The evidence supports the conclusion that Wolf intended to use the machinegun to facilitate these felonies—both in the form of the murders and assassinations he claimed to want to commit, and his plan to "scare the living hell out of some police officers" with the weapon.

Additionally, Montana law provides, that "[a] person commits the offense of arson when, by means of fire or explosives, the person knowingly or purposely," in pertinent part, "(a) damages or destroys a structure, vehicle, personal property (other than a vehicle) that exceeds $1,500 in value, crop, pasture, forest, or other real property that is property of another without consent," or "(c) places another person in danger of death or bodily injury, including a firefighter responding to or at the scene of a fire or explosion."    MCA 45-6-103.

In his conversation with Ed Gray immediately after viewing the video of Dirty firing the machinegun, Wolf described his desire to mount a flamethrower "under the barrel of that shotgun so it sticks out maybe a little bit past the end of

the shotgun."   That was not first time Wolf described his intention to use

flamethrowers against people and property.   He described using a flamethrower

against a BearCat police vehicle, saying, "[t]hese people had turned it into an easy

bake oven.   These people can't live in a tank and if they do then they're not

effective.   They only have a certain amount of gun ports.   Well, last time I

checked a flamethrower will go through a gun port."   Gov. Trial Ex. 10c.

On cross examination, the defendant conceded that it would be illegal to use

a flamethrower "to light somebody on fire."   WTT at 94.   But when asked if "it

would be illegal to stick that flamethrower through the port of a Bear Cat vehicle in

Bozeman and, quote, 'roast it from the inside,'" the defendant testified: "[i]f the

law stood, yes.   But as I've clearly stated, once this goes down, once the war

starts, I will do whatever is necessary to help end the war quickly."   WTT at

94-95.

Using a flamethrower mounted on the end of a machinegun to attack a law

enforcement vehicle is arson.   So is dropping 500 pounds of napalm on a

courthouse to burn it to the ground.   Gov. Trial Ex. 11a.   And, of course, using

the machinegun-mounted flamethrower against other people would be a violation

of arson and assault statutes.   Likewise, using incendiary rounds of ammunition in

the shotgun to light someone on fire would also be assault, arson, and attempted

homicide.[1]   Gov. Trial Ex. 12c (stating his intent to use "phosphorus rounds. And so what happens is it lights their fucking clothes on fire."); *see also* Gov. Trial Ex. 10b (Wolf wanting to light their body armor on fire with incendiary rounds of ammunition if they do not die from the buckshot).

Both the government's evidence and the defendant's own testimony support the application of the four-level increase.   The evidence at trial showed that he wanted the machinegun to use in the war he believed was imminent, and was preparing to use the machinegun—with a mounted flamethrower—to damage property, commit arson, and to threaten, assault, and kill those who disagreed with his beliefs.

### b. Wolf obstructed justice by committing perjury during his trial testimony.

The Guideline calculation correctly includes a two-level increase for obstruction of justice because Wolf willfully committed perjury when testifying at trial regarding material issues.   Section 3C1.1 provides for a two-level increase in the offense level if:

> the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct.

---

[1] If anyone died as a result of Wolf's actions, he would be guilty of deliberate homicide under MCA 45-5-102.

U.S.S.G. §3C1.1.    Conduct that can trigger this provision includes, "committing,

suborning, or attempting to suborn perjury" or "providing materially false

information to a judge or magistrate judge."    U.S.S.G. §3C1.1. cmt. n. 4(B), (F).

"A witness testifying under oath or affirmation [commits perjury] if []he

gives false testimony concerning a material matter with the willful intent to

provide false testimony, rather than as a result of confusion, mistake, or faulty

memory."   *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).    When

determining whether to apply an enhancement under §3C1.1, "a district court must

review the evidence and make independent findings necessary to establish a willful

impediment to or obstruction of justice, or an attempt to do the same, under the

perjury definition we have set out."    *Id.* at 95; *see also United States v. Taylor*,

749 F.3d 842, 848 (9th Cir. 2014) (should include a finding that the defendant

acted willfully).

Wolf will likely claim that he did not commit perjury because he was merely

exercising his constitutional right to testify.    While he is correct that he has a right

to testify, he does not have a right to testify falsely.    As the Supreme Court made

clear, "we have held on a number of occasions that a defendant's right to testify

does not include a right to commit perjury."    *Dunnigan*, 507 U.S. at 96.

In this case, Wolf gave false testimony about a material element of the

offense.    An element of both counts of conviction required the government to

11

prove that Wolf knew of the characteristics of the firearm, that is, that it was a machinegun.   18 U.S.C. § 922(o); *United States v. Gravenmeir*, 121 F.3d 526, 528-30 (9th Cir. 1997); *United States v. Montoya-Gaxiola*, 796 F.3d 1118 (9th Cir. 2015).   Wolf provided extensive testimony that he thought he was purchasing a semiautomatic firearm—in other words that he did not know the gun he possessed was a machinegun.   *See, e.g.*, WTT 25.   Wolf not only denied that fact, he told extensive lies trying to convince the jury that he believed he had ordered and possessed a semiautomatic firearm.   His stories were unbelievable and completely false.

Wolf testified that Ed Gray visited him at multiple construction job sites where they had discussions about shotguns.   WTT 13-18.   Wolf testified that at these various meeting, Gray would ask him "Hey have you chosen a shotgun yet?" *Id.* at 17, 18.   Wolf further testified that he ran into Gray at the Bozeman Kenyon Noble hardware store.[2]   *Id.* at 24.   He claims he then told Gray that he wanted a fully automatic Saiga-12 shotgun converted into a semiautomatic.   *Id.* at 25. Wolf testified that Gray came to his home the Sunday after Thanksgiving and they again talked about shotguns.   *Id.* at 26.   Wolf said that he told Gray at that time he wanted a Saiga and to make sure Dirty had a Class 3 dealer who would convert

---

[2] Other trial testimony wholly contradicted this specific claim about running into Gray at the hardware store in Bozeman because Ed Gray was not living or working anywhere near Gallatin County at that time, he was living and working near Roundup, Montana.

a fully automatic shotgun to a semiautomatic.   *Id.* at 26-27.   Wolf said, "I want a

Saiga 12-shotgun fully automatic shotgun.   I want him to convert into a

semiautomatic."   *Id.* at 27.

Wolf testified that Gray later came to the Black Bull job site and he gave

Gray an article from Guns and Ammo magazine about the Saiga-12 shotgun.   *Id.*

at 46.   He testified that he told Gray, "I researched this to death, and I gave the

paper of the article from a respectable gun magazine to Ed Gray, and I said, 'This

is what I want.'"   *Id.*

But these meetings never took place and Wolf never had any of these

discussions with Gray at these job sites or anywhere else.   Gray specifically

testified, he "had never been to the Black Bull Subdivision in my life."   Gray

Trial Tr. at 44 (*hereinafter* "GTT").   Likewise, defense counsel asked Gray, "And

then a little bit later in March, there was a downtown project that Mr. Wolf was

working on that you went to visit him at; is that true?"   *Id.*   Gray responded, "No

that is not true."   *Id.*   Furthermore, Gray testified that Wolf never gave him an

article about the Saiga shotgun.   *Id.*

Indeed, Gray testified that Wolf never talked to him about his desire to get a

shotgun until the December 18, 2014, meeting with Dirty which was recorded.

GTT at 41.   There simply were no previous discussions about a shotgun as

claimed by Wolf.   This is further confirmed by the recorded conversations played

at trial where Wolf's initial focus was solely on obtaining a flamethrower.   *See*

*also*, WTT at 22 (acknowledging that he brought up getting a flamethrower "quite

often" because it was a "unique weapon.").

Likewise, Gray confirmed that Wolf never told him he wanted a fully

automatic firearm converted to a semiautomatic.   *Id.* at 41-42.   On cross exam,

Gray testified:

Q:   So, you're testifying that you never did talk with him about what he

wanted in this gun or what happened with this gun?

A:   No.

Q:   This Saiga that he was -- that he had interest in?

A:   No, I did not talk to him about it.

Q:   Your testimony is that you didn't talk to him about his desire to have

that Saiga converted to a semiautomatic?   Is that your testimony?

A:   I did not talk to him about that, yes, I did not.

Q:   Did he talk to you about it?

A:   <u>No, he did not</u>.

*Id.* at 42 (emphasis added).

In fact, Gray reiterated that the only discussion about a conversion was when

<u>Gray</u> told Wolf [on January 28, 2015,] that Wolf would have to pay extra for the

fully automatic shotgun because it needed to be converted from semiautomatic to

fully automatic.   *Id.* at 47-48, 55; Gov. Trial Ex. 12a.   And, Wolf never asked, "Did they switch it to semiauto?"   *Id.* at 48.   Again on redirect, Gray confirmed that Wolf never said he wanted it switched from full auto to semiauto.   *Id.* at 56. Gray again reemphasized that "[Wolf] never ever asked about it being semi.   He always wanted full auto from the time he brought it up to us."   GTT 57.   Defense pressed Gray, "[e]xcept the times that he asked you what was going on with the gun?   And is it being switched to semiauto?"   *Id.*   Gray again emphasized that, "[t]hat never happened, no."   *Id.*   Wolf's story about converting a gun from full to semiautomatic defies all credulity and common sense as the jury ultimately concluded.[3]

Wolf's stories about the meetings and the discussions regarding the type of shotgun came down to Wolf's word against Gray's.   Defense counsel acknowledged this fact when questioning Wolf.   "Mr. Gray, and of course, you heard his testimony; he denies having any conversations with you about shotguns. You understand that: right?"   Wolf responded, "Yeah I understand that."   In sum, the jury did not believe Wolf's testimony and his prevarications.   The jury instead gave full credit to Gray's testimony that Wolf never asked for a semiautomatic firearm or had these alleged additional meetings/conversations with Gray.

---

[3] The believability of Wolf's testimony is further diminished when considered in light of his statements on the undercover recordings.

Wolf further lied about a material element of the offense of possessing a shotgun with a shortened barrel.   To convict under this statute, the government had to prove that Wolf knew the barrel length of the shotgun was less than 18 inches.   Wolf testified that because of this article from Guns and Ammo magazine he believed the shorter barrel would be 24, 22, and 19 inches.   WTT 48, 60, and 62.   Wolf testified that he believed he was getting a gun with a barrel of "18-and-a-quarter inches."   *Id.* at 62.   But the evidence showed otherwise.

Wolf sent a text message to Gray saying he wanted a gun with a "shortened" "Mil barrel" (military barrel).   Gov. Trial Ex. 14.   Wolf was later heard on a recording telling his friend Gary Hunt, "the thing is, is that, that military version only comes as a fully automatic with a fourteen inch barrel."   Gov. Trial Ex. 17c. Indeed, the evidence showed Wolf was lying at trial claiming that he did not know the barrel length was less than 18-inches and that he believed it was the same as the Guns and Ammo magazine article.   *See also*, WTT 83-84 (Wolf giving conflicting accounts on cross examination of ordering a 14-inch barrel or an 18-inch plus barrel).

Wolf willfully committed perjury on multiple material issues and the two-level increase should be applied.

16

### III.    Consideration of the § 3553(a) factors demonstrates that an upward variance is needed and that a 120-month sentence is necessary and reasonable.

The advisory Guidelines are insufficient to meet the goals of sentencing in this case because they do not account for Wolf's extreme characteristics, reflect the seriousness of this offense, promote respect for the law, afford adequate deterrence to criminal conduct by Wolf and others, and protect the public from further crimes from Wolf.   Section 2K2.1 does not factor in Wolf's firm determination to commit violent acts.   Likewise, it does not account for Wolf's animosity for the law and for his targeting of law enforcement officials at all levels—local, state, and federal.   He was preparing for a "war" against these officials by arming himself with the most dangerous weapons to facilitate kidnapping, assault, and killing to bring about his revolution.

Given the extreme factors presented here, the advisory Guidelines are insufficient at achieving a just and proper sentence, and thus an upward variance of 57 months is needed.   As detailed below, an upward variance to a Guideline range of 155-188 months would be reasonable in this case.   Nevertheless, the United States recommends a sentence of 120 months, the statutory maximum sentence for each count of conviction.

17

### a. Wolf's history and characteristics evidence his extremism.

Section 3553(a) directs the Court to consider a defendant's past criminal history.   Often, when a defendant has little or no criminal history, that fact is used as a benchmark—or quantifiable risk factor—to assist the Court in determining that the individual poses less of a risk to society and toward recidivism. Conversely, when a defendant has an extensive criminal history with a large criminal history score, a greater sentence may be necessary to protect the public and prevent future crimes by that individual.   In this case, Wolf has no prior convictions and criminal history score of zero.   PSR ¶ 45.

But, Wolf's lack of criminal history does not accurately capture his true risk to society and potential to commit future violent crimes or shootings.   Indeed, as has been seen in many recent mass shootings across the country, a lack of criminal history is not necessarily predictive of a lack of violence or propensity to commit a mass shooting.   For these reasons, among others, § 3553(a) directs that Wolf's history should be considered together with his characteristics.   Wolf's characteristics are not quantifiable within the Guideline calculation but do demonstrate that the calculation underrepresents the needed sentence.

Wolf's characteristics confirm his self-proclaimed status of an extremist in every sense of that word.   Wolf stood ready, willing, and capable of committing violence.   He took steps toward those violent intentions by, in his own words,

seeking to obtain the most extreme devastating weapons he could.   He stated, "who gives a damn about Geneva Convention, what's the most devastating weapons that we can use…."   Gov. Trial Ex. 13f.   It is telling that even the undercover FBI agent who has been investigating domestic terrorists/extremists and large scale drug trafficking organizations for more than 25 years testified that when Wolf asked him for a fully automatic shotgun, he did not even know there was such a thing and went back to the hotel to research it on the internet.

Wolf's very purpose of acquiring this devastating weapon was to use it to kill—specifically to kill public officials as quickly as possible.   And if that was not enough, he was going to mount a flamethrower to the gun to make it even more lethal.   He knew law enforcement officers would likely be wearing body armor or bullet proof vests.   Thus, he wanted a weapon that could overcome that obstacle.

When Gray showed Wolf the video recording of Dirty shooting the machinegun, Dirty said, "You can tell from that plywood, like you said, that, uh, we were talking about body armor (Wolf laughing) body armor ain't gonna help." Gov. Trial Ex. 15.   Wolf was heard laughing as he saw the full capabilities of the weapon displayed for the first time.   *Id.*   Then laughing again, Wolf responds, "that's why I wanted it."   *Id.*   Wolf was especially excited to get his hands on this weapon.   He was thrilled and giddy.   He knew it would fulfill his criminal purposes and he enjoyed the thought of getting to shoot someone wearing body

19

armor.   Likewise, he knew that if for some reason the firearm did not kill the

officers with the deluge of bullets fired by the machinegun, he could then light

their body armor on fire with his flamethrower and watch them burn in a horrific

death.

        In Wolf's world view, his "war" with law enforcement was unavoidable.

WTT 42-43 ("when the war comes, but the 'if' is no longer a question in my mind.

I believe the war is coming.").   As Wolf testified, "I fully believe that there is no

peaceful resolution to this government."   *Id.* at 31.   In other words, he remained,

even at trial, undeterred and committed to carry out violent acts with dangerous

weapons; though he says he would like to "get the problem done fast.   Put the fear

of God back in the people.   And maybe a get a few officers to surrender before

we - - they, you know, it actually goes."   *Id.* at 31-32.

        The trial evidence showed no less than 24 instances where Wolf stated his

intent to kill someone or engage in acts that would bring about the death of another

person.   Gov. Ex. A.   There are at least 26 instances[4] where Wolf discusses

committing an act of assault or aggravated assault.   Gov. Ex. A.   And there are

at least 3 incidents where Wolf reaffirms his commitment to kidnap and "arrest"

judges.   Gov. Ex. A.   As Wolf made clear, "[w]hen the war starts, there won't be

---

[4] Some of these acts overlap with those where he also states an intent to kill.

anyone who is safe.   Just because you have a badge or a black robe is not going to protect you."   Gov. Trial Ex. 4d.

Wolf will likely argue that all these statements were just talk, just bravado and puffing; that he never was actually going to take any action.   That is not true. He was dead set on acting and carrying through with his plans.   When his supporters at the January 29, 2015, committee of safety meeting told Wolf they thought it might be too violent to bomb the courthouse, he said, "[s]ee but that's the difference between you and I…That's the way I am and that's the way they know I am."   Gov. Trial Ex. 11a.   He reemphasized that, "I mean I really am not all the good person that people think I am."   Gov. Trial Ex. 11b.   Again he told them how committed he was to such acts of "war."   "But I'm here to inform you that when you fail, I will succeed."   Gov. Trial Ex. 11c.

The Court should rely upon Wolf own words, which show his violent extremism on full display.   Those statements are reliable.   They illustrate his true intent.   The Court should take him at his word.   Just as he attempted to minimize his culpability at trial by lying about his intent to purchase a fully automatic firearm, he will now attempt to minimize his numerous statements about killing others by saying that he was not really serious.[5]   Now that he is facing up to 20

---

[5] Wolf tried to minimize his statement about wanting the gun to "clean house" with as wanting the shotgun merely for home defense.   Wolf Trial Tr. 43.   He minimized a second statement about using the gun to "clean the streets" by claiming

years in prison, of course he will minimize to the Court.    His prior statements are the most reliable indicator of his true character and intent to commit violence.

### b.  The nature and circumstances of the offense are extreme.

The firearms Guideline provision under §2K2.1 is routinely applied to drug traffickers with a previous felony that possess a firearm to protect their stash. That is not the case here.    The circumstances of this offense pose a significantly greater danger and risk of harm to others than does the routine felon in possession of firearm case that §2K2.1 is designed to cover.    Here, §2K2.1 underrepresents the seriousness of this particular offense and does not take into account the purposes for which Wolf sought out this extreme and dangerous weapon. Protecting your drug stash from other drug traffickers is of course dangerous.    But purposely seeking out the most dangerous weapon you can with the intent of engaging in a "war" with government officials by "putting the fear of God in them," assaulting them, lighting them on fire with the flamethrower attached to your machinegun, and ultimately killing them to accomplish your social or political purposes rises to a level unfamiliar to most criminal cases.    A significant upward variance is needed to account for this extreme case.

---

that words have double meaning.  *Id.* at 44.   The jury found such minimization unconvincing and untruthful, especially when taken in context of all of Wolf's other statements in the recordings and even his own testimony about using the gun to "<u>go out</u> and scare the living hell out of some police officers…"—noticeably expressing his intent to use the gun outside of his home.  *Id.*

The undercover FBI agent who has been investigating these types of extremists for more than 25 years testified that he had never investigated someone so eager and willing to move forward with obtaining an illegal weapon as was Wolf.   Wolf was committed, ready to act, and was moving his plans forward. Just like Wolf told his supporters, the time for talking was done.

Moreover, it was not enough for Wolf to possess a weapon with just one illegal characteristic; he needed to make it the most dangerous weapon he could. Wolf wanted a shotgun that was fully automatic <u>and</u> that had a sawed off barrel so it would do more damage.   Section 2K2.1 does not have any additional scoring for such a weapon with these two simultaneous illegal characteristics.   But a corollary under the Guidelines would be an illegal weapon that also had an obliterated serial number—an additional illegal feature of an already illegally possessed firearm.   Possessing a firearm with an obliterated serial number would increase the Specific Offense Characteristics score by 4 levels.   U.S.S.G. §2K2.1(b)(4)(B).   Had a similar 4 levels been applied to Wolf's Guideline calculation—because his illegal firearm also had an additional illegal feature—it would have given him an Adjusted Offense Level of 28.   *See* PSR ¶ 41.   Wolf's Guideline range would then be 78-97 months.

Likewise, under §5K2.6, the Guidelines provide for a basis for an upward departure based upon the dangerousness of the weapon possessed by the defendant.

23

This provision suggests it is warranted to depart upward for a more extreme or more dangerous weapon.   Certainly the defendant's weapon of choice with multiple illegal characteristics meets such a definition.   The government does not suggest departing upward under §5K2.6 in the Guideline calculation, PSR ¶¶ 33-41, but that the provision shows that the current Guideline calculation does not fully account for the dangerousness of weapon.   Accordingly, the Court should use the extreme dangerousness of the weapon as a basis to vary upward under §3553(a).

Furthermore, the Guideline calculation does not account for the fact that the intended victims of Wolf crime were official victims.   Had Wolf not been arrested, and continued forward with his intent to kill public officials, a 6 level increase would have been applied under §3A1.2(c)(1).   That Guideline would apply because Wolf's actions would have created a substantial risk of serious bodily injury knowing or having reasonable cause to believe that a person was a law enforcement officer.   *Id.*   Indeed, the Guidelines place significant value on the protection of public officials; that same value should be captured when considering the § 3553(a) factors.   If the 6 levels were applied in this case, Wolf's Adjusted Offense Level would be 30, and his Guideline range would then be 97-121 months.   *See* PSR ¶ 41.   Adding the additional 4 levels under §2k2.1(b)(4)(B) discussed previously would give Wolf an Adjusted Offense Level

of 34 and a final Guideline range of 151-188 months.   Thus, even a 120-month

sentence does not fully capture the true nature and circumstances of the offense.

### c.  There is a strong need to protect the public from Wolf.

Wolf poses a pronounced risk to society and to law enforcement officials.

A significant upward variance is needed to protect the public.   This one factor

alone warrants a sentence of 120 months.   Wolf has specifically named at least

three public servants as targets—Judge Rick West, Gallatin County Sheriff Brian

Gootkin, and Gallatin County Attorney Marty Lambert.   WTT at 7-8, 64; Gov.

Trial Ex. 4d, 11b (Wolf, "that is why Sheriff Gootkin stays his ass away from me,

got Marty Lambert keeps his ass away from me because they know who I am.   I

cannot be committee of safety.").   Furthermore, he has named all other persons

who wear a badge and a black robe as targets.

At trial, this Court heard the chilling account of Wolf's willingness to come

into a courtroom and haul the judge off the bench right in front of everyone

without a warrant or probable cause.   WTT at 70; Gov. Trial Ex. 4c.   Even when

pressed on cross examination about the unreasonable nature and lawlessness of

such an act, he did not back down.   WTT at 70.   He believes he has the lawful

right to do this.   *Id.*   He believes this is a "peaceful resolution" to his grievances.

*Id.* at 70-71.

But Wolf also described his "preferred method" as "drop[ing] five hundred pounds of napalm through the roof of the [Gallatin County Courthouse] and burn[ing] it to the ground and roast some marshmallows on it."   Gov. Trial Ex. 11a.   He then declared, "that's why I say you don't want me doing this because I don't believe in doing anything that's not extreme and right now wiping that place out, would be my extreme movement."   *Id.* (emphasis added).   Then he said he would move to the next building.   "[T]hen my answer would be okay which county and city building is going to be next...[t]hat's all I believe in, you hit them with a great big hammer."   *Id.*

The only way to protect the public from Wolf, his extreme movement, and his great big hammer, is a sentence of 120 months.   Sentences above the Guideline range are appropriate where there is a strong need to protect the public from violence by the defendant.   *See, e.g.*, *United States v. Doran*, 621 F. App'x 410, 411 (9th Cir. 2015) (unpublished) (a significant upward variance by imposing a sentence three times the high end of the Guidelines range was reasonable to protect the public); *United States v. Eagle*, 451 F. App'x 683, 684 (9th Cir. 2011) (unpublished) (above Guideline sentence of 180 months was reasonable to protect the public from further crimes by defendant); *United States v. McIntosh*, 384 F. App'x 578, 579 (9th Cir. 2010)(unpublished); *United States v. Blake*, 285 F. App'x

449, 451 (9th Cir. 2008)(unpublished) (upward variance based upon deterrence and need to protect the public).

Wolf has shown the ability, determination, intent, and the desire to commit violent crimes against the public.   There is a significant risk that he will commit further crimes and a significant sentence is needed.   The United States firmly believes Wolf poses a very real danger.   He poses a serious threat to judges, law enforcement officers, and the public at large.   Thus, the United States urges this Court to impose the 120-month sentence to protect the public from Wolf's extremism and lawlessness.

### d.  An upward variance is needed to promote deterrence for Wolf and for others.

Even after being convicted by the jury, Wolf still has no remorse, contrition, or any acknowledgment that he did anything wrong.   In a February 1, 2016, letter written by Wolf to his associate Gary Hunt[6]—who repeatedly appeared on Wolf's

---

[6] Gary Hunt tried to appear as Wolf's "Next of Friend" in this case by filing a Writ of Mandamus on Wolf's behalf.   Doc. Num. 14.   This Court struck the filing and Ordered that Hunt has no authority to intervene or otherwise make himself a party to this action.   Doc. Numbs. 16,17.

Hunt was also one of the occupiers of the takeover of the federal Malheur National Wildlife Refuge in Oregon.
http://talkingpointsmemo.com/livewire/oregon-occupiers-call-to-arms (last visited February 17, 2016).   "Operation Mutual Defense, a network of militias and patriot sympathizers, issued a call on its website for help at the refuge.   The post was written by Gary Hunt, a board member from California who has expressed support for Timothy McVeigh, who bombed a federal building in Oklahoma City and had ties to the patriot movement."

Montana Republic broadcast and who shares the same views toward violence against public officials—both continue to blame the FBI, Ed Gray, the Department of Justice, and the "obstruction" of this Court by "placing herself, with the aid of the law, above justice."   Gov. Ex. B.   Wolf again attempts to use the constitution as a justification for his criminal behavior.   But there is no justification to possess a machinegun with the intent to use it to commit violent acts against public officials.   Wolf remains undeterred.   A lengthy sentence is needed to deter Wolf, and others, from committing similar crimes and/or violent acts in the future.

### e.  A 120-month sentence is needed to promote respect for the law.

Wolf has no respect for the law.   The United States will not restate all the numerous incidents evidencing Wolf's complete disrespect for the law again here. But as the evidence shows, Wolf has made law enforcement and judicial officers his targets.   He uses his own twisted independent views and interpretation of the law and the constitution to justify himself and his violent acts.   At trial, Wolf made it unmistakable that he would throw the law out the window in his coming war.   His perjured trial testimony further highlights his intent to manipulate and misuse the law and the legal system to accomplish his self-serving interests.   He

---

http://www.oregonlive.com/oregon-standoff/2016/01/bundys_in_custody_one_militant.html (last visited February 17, 2016).   "You have an obligation to proceed to the Harney County Resource Center (the wildlife refuge) immediately," Hunt wrote. "If you fail to arrive, you will demonstrate by your own actions that your previous statements to defend life, liberty, and property were false."   *Id.*

had no respect for the jury or this Court, imagining he could outsmart everyone in the courtroom by trying to convince them of his obvious fabrications.   A significant sentence is needed to address his contempt for the law.

### IV.   Conclusion

For all the reasons stated above, the circumstances of this case warrant a substantial period of incarceration.   An upward variance of 57 months is needed and a total sentence of 120 months is reasonable and not greater than necessary to address Wolf's violent extremism.

DATED this 24th day of February, 2016.

MICHAEL W. COTTER
United States Attorney

*/s/ Bryan R. Whittaker*
Assistant United States Attorney

*/s/ Danya E. Atiyeh*
Trial Attorney
Counterterrorism Section
National Security Division
United States Department of Justice

Attorneys for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to D. Mont. L.R. 7.1(d)(2) and CR 47.2, the attached United States

Sentencing Memorandum is proportionately spaced, has a typeface of 14 points or

more, and the body contains 6393 words.

<u>/s/ Bryan R. Whittaker</u>
Assistant United States Attorney
Attorney for Plaintiff